## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **INTERNATIONAL PROCESSPLANTS AND EQUIPMENT CORP.,**<br>                    **Plaintiff,** | **CIVIL ACTION** |
| **v.** | **NO.  22-01630** |
| **FIRST STANDARD ASURETY, LLLP; DAVID HARRIS; METRO INDUSTRIAL WRECKING & ENVIRONMENTAL CONTRACTORS, INC.; MIWEC ASSET RECOVERY, INC.; RINO ROTONDO; AMERICAN EAGLE SERVICES GROUP, INC.; and PAUL MAUCHA,**<br>                    **Defendants.** | |

**Hodge, J.**                                                    **March 6, 2025**

## MEMORANDUM

### I.    INTRODUCTION

Plaintiff International ProcessPlants and Equipment Corp. ("IPP") commenced this action against Defendants First Standard Asurety, LLLP ("FSA"), FSA owner David Harris, Metro Industrial Wrecking & Environmental Contractors, Inc. ("Metro"), MIWEC Asset Recovery, Inc. ("MIWEC"), Metro and MIWEC owner Rino Rotondo, American Eagle Services Group, Inc. ("AESG"), and AESG owner Paul Maucha (collectively "Defendants"), asserting claims for civil Racketeer Influenced and Corrupt Organizations Act ("RICO") violations under 18 U.S.C. §§ 1961-1968 and common law fraudulent inducement and conversion. (ECF No. 23.)

After failing to respond to IPP's Amended Complaint, defaults were entered against Defendants AESG and Rotondo. (ECF Nos. 27, 28.) FSA and Harris (together "the FSA Defendants") and Metro, MIWEC, and Rotondo (together "the Metro Defendants") then filed

1

separate Rule 12(b)(6) Motions to Dismiss for Failure to State a Claim. (ECF Nos. 36, 40.) The Metro Defendants also filed a Motion to Vacate the default entered against Rotondo and a Motion to Dismiss for Improper Venue or Transfer pursuant to FRCP 12(b)(3) and 28 U.S.C. §1404(a), and for failure to state a claim pursuant to FRCP 12(b)(6). (ECF No. 40.)

The Court having considered the motions and all responses thereto orders that: the FSA Defendants' Motion to Dismiss (ECF No. 36) is denied; Defendant Rotondo's Motion to Vacate the Default is denied; the Metro Defendants' Motion to Dismiss for Improper Venue or Transfer (ECF No. 40) is denied; and the Metro Defendants' Motion to Dismiss for failure to state a claim is granted. As to the claims against the Metro Defendants, the RICO claim (Count I) and Fraudulent Inducement claim (Count II) are dismissed without prejudice. IPP's Conversion claim against the Metro Defendants (Count III) is dismissed with prejudice.

## II.    **FACTUAL BACKGROUND**[1]

At the Motion to Dismiss stage, the Court must take Plaintiff's allegations as true. IPP describes the facts as follows. This dispute arises out of a demolition project at the site of a former chemical manufacturing plant located at 900 River Road, Conshohocken, Pennsylvania (the "Project"). (ECF No. 23 ¶ 18.) IPP entered into a contract with the owner of the plant facility, under which IPP agreed to purchase and remove items including salvageable equipment, spare parts, and accessories, and to demolish the buildings, infrastructure, and structures at the site. (*Id.* ¶ 19.) On or about November 26, 2019, IPP entered into a subcontract with Metro (the "Subcontract"), under which Metro agreed to perform the dismantling, rigging, removal, and loading of equipment from the site, as well as the scrapping and demolition of the buildings, infrastructure, and structures, in exchange for payment of $100,000 to IPP and Metro's retention

---

[1]    The Court adopts the pagination supplied by the CM/ECF system.

of scrap salvage rights. (*Id.* ¶ 20.) In order to secure Metro's obligations under the Subcontract, Metro was required to procure a performance bond and a payment bond for IPP's benefit, at Metro's own cost and expense. (ECF No. 23-1 at 10.) On or about December 17, 2019, Metro procured these bonds—an AIA Document A312 – 2010 Performance Bond (the "Performance Bond") and an AIA Document A312 – 2010 Payment Bond (the "Payment Bond")—from FSA. (ECF No. 23 ¶ 22.)

IPP claims that throughout the course of the Project, Metro consistently failed to complete its work in a timely manner and in compliance with the Subcontract. (ECF No. 23 ¶ 23.) Metro's breaches of the Subcontract included failing to provide proper equipment; using faulty, worn equipment; failing to provide a qualified labor force; failing to employ competent project managers; failing to adhere to the project schedule and causing delays; and failing to fulfill required payments to subcontractors and suppliers. (*Id.* ¶ 24.) When IPP informed Metro of its breaches, Metro failed to remedy or cure the breaches, or even respond to IPP's communications. (*Id.* ¶ 25.) Due to Metro's breaches, IPP exercised its rights under the Subcontract to terminate Metro for default. (*Id.* ¶ 26; *see also* ECF No. 23-3 at 2.) IPP then filed the Demand for Arbitration against Metro with the American Arbitration Association ("AAA"), as required under the Subcontract. (ECF No. 23 ¶ 27; ECF No. 23-1 at 16.) The Arbitration was captioned AAA case no. 01-20-0019-3703. (ECF No. 23 ¶ 27.)

On or about December 3, 2019, IPP sent FSA, Metro's surety, a formal Notice of Claim under the Performance Bond, demanding that FSA reimburse IPP $759,628.36 to remedy Metro's material breaches. (ECF No. 23 ¶¶ 28-29.) The damages included "the unpaid balance due IPP for (supplemental) work performed and invoiced; the unpaid balance due Metro's subcontractor IPE Rigging for work performed and invoiced; and the unpaid balance due Metro's subcontractor

People's and Sons for work performed and invoiced." (ECF No. 23 ¶ 30.) IPP also demanded that FSA indemnify and hold harmless IPP for other costs, damages, and expenses that resulted from Metro's breaches. (*Id.* ¶ 31; *see also* ECF No. 23-4 at 3.) IPP later amended the amount of damages to $459,830.44, when Metro's unpaid subcontracts declined to file mechanics' liens by the statutory deadline. (ECF No. 23 ¶ 32.)

FSA did not respond to IPP's notices or otherwise communicate with IPP until January 31, 2021[2]—more than a year after IPP sent FSA its initial Notice of Claim—when FSA sent IPP an email denying IPP's claim under the Bond. (ECF No. 23 ¶ 33; *see also* ECF No. 23-5 at 2.) According to IPP, the denial letter included "demonstrably false" statements, and mischaracterized express provisions of the Subcontract as well as the Performance Bond itself. (ECF No. 23 ¶ 34.) IPP identifies one such mischaracterization in its amended complaint— "FSA stated that the Subcontract required IPP to remit payment to Metro (in the amount of $700,000.00), but rather it was Metro who paid IPP $100,000.00, in exchange for scrap salvage rights on the Project." (*Id.*) In addition, FSA questioned IPP's qualifications under the Payment Bond, despite IPP bringing its claims under the separate Performance Bond. (*Id.* ¶ 35.) On February 4, 2021, IPP filed a complaint in the Eastern District of Pennsylvania against FSA; that case (Civil Action No. 2:21-cv-00525) was stayed when FSA agreed to participate in the AAA arbitration. (*Id.* ¶ 36.)

On or about April 27, 2021, the United States Department of Justice filed an indictment against Defendant Paul Maucha, the owner, agent and trustee of Defendant AESG, alleging that through AESG, Maucha committed criminal acts including offering fraudulent surety bonds. (ECF No. 23 ¶¶ 15-16, 37; ECF No. 23-6.) Under the scheme, "Mr. Maucha and AESG 'committed to pay out on the surety bond to a third-party beneficiary if the purchaser of the bond failed to meet

---

[2]    The email from FSA referenced in the complaint is dated January 29, 2020. (ECF No. 23-5 at 2.) This appears to be a typo in the original email; the year included in the email should have been 2021.

its obligations to the third-party beneficiary[,]' despite the fact that neither Mr. Maucha nor AESG . . . 'had the assets to back any of the proposed surety bonds.'" (ECF No. 23 ¶ 38 (citing ECF No. 23-6 at 8).) On August 24, 2022, AESG's former Chief Operating Officer and Maucha's alleged co-conspirator, Melisa Shapiro, entered a guilty plea and admitted that AESG's surety bonds were fraudulent and not backed by assets or underwriting. (ECF No. 23 ¶ 39.)

IPP asserts that all named Defendants were involved in Maucha's surety bond scheme. (ECF No. 23 ¶ 40.) Specifically, IPP alleges that Metro, through its owner and agent, Defendant Rino Rotondo, "induced IPP to enter into the Subcontract and thereby grant Metro lucrative scrap salvage rights on the Project, by providing surety bonds and related instruments from FSA and Mr. Harris." However, those surety bonds were underwritten by AESG, which did not have assets or capital to back the bond. (*Id.* ¶ 41.) During the bid process for the Project, FSA owner Harris provided IPP a signed letter stating that based on Metro's experiences and financial strength, its "bonding capacity for bid and performance bonds is currently $10,000,000.00." (*Id.* ¶ 42.) In fact, IPP alleges that Harris and FSA never received any financial records, collateral, or personal guarantee from Metro, and had never analyzed Metro's financial strength. (*Id.* ¶ 43-44.)

In communications prior to IPP and Metro entering into the Subcontract, IPP's General Counsel and Harris exchanged communications in which Harris told IPP that "Standard bankable Cash assets" of "$100mm+" would be held in trust as collateral for the surety bonds at a top ten bank. (ECF No. 23 ¶¶ 46-49.) Rotondo was copied on these communications. (*Id.* ¶ 47.) Harris told IPP the assets would be held "until released to pay an investigated and approved Default claim," and he promised to provide IPP with a receipt of the Irrevocable Trust at the time the bond was issued. (*Id.* ¶ 51; ECF No. 23-8 at 3.) IPP was also told that AESG had cash assets at Wells

Fargo bank of at least $20 million, and that a $700,000 escrow account with IPP named as obligee of the bond was set up at Wells Fargo. (*Id.* ¶¶ 51-52.)

The Alleged Scheme

IPP describes the "scheme" between Defendants as follows: because Metro/MIWEC/Rotondo were unable to obtain surety bonds from a "t-listed" surety, that is, a surety company authorized by the U.S. Treasury Department, they instead relied on FSA, a private surety that charges higher rates than a t-listed surety would. (ECF No. 23 ¶¶ 61-62.) On April 2, 2017, FSA and AESG entered into a "Trust and Surety Working Agreement," under which FSA referred all surety applicants to AESG for underwriting. (*Id.* ¶ 63; ECF No. 23-13.) AESG has been the underwriter for all FSA bonds since 2017, including all bonds FSA provided to Metro (including for projects unrelated to this lawsuit). (*Id.* ¶ 64.) For each bond, Metro paid FSA a fee, half of which FSA then paid to AESG. (*Id.* ¶ 65.) Metro then entered into contractual relationships based on representations about the bonds. (*Id.* ¶ 66.) This practice continued between Metro/MIWEC/Rotondo, FSA and Harris, and AESG and Maucha even after Maucha was indicted. (*Id.* ¶ 67.)

With respect to the Project at issue and the subcontract between IPP and Metro, on December 4, 2019, Metro/MIWEC/Rotondo[3] remitted payment of $28,000 to FSA for the Performance Bond and Payment Bond. (ECF No. 23 ¶ 57.) Harris paid half of the $28,000 to AESG and Maucha. (*Id.* ¶ 59.)

---

[3]    Although IPP's subcontract was with Metro, IPP alleges that Rotondo "operates Metro and MIWEC without due regard for corporate and entity formalities. Mr. Rotondo commingled the resources, assets, and funds of Metro and MIWEC. Metro and MIWEC have the same business address and phone number, and utilize the same personnel." (ECF No. 23 ¶¶ 11-13.)

Arbitration

After a seven-day presentation of evidence in the AAA arbitration, the Arbitrator ruled that Metro materially breached its Subcontract with IPP and that FSA did not breach the provisions of the Performance Bond provided to Metro for the Project. (ECF No. 23 ¶ 78.) The Arbitrator ruled Metro was liable to IPP for damages of $1,991,909.88, with accruing interest, as of October 1, 2022. (*Id.* ¶ 79.) The Arbitrator did not consider FSA's liability to IPP on issues other than breach of the Performance Bond provisions. (*Id.* ¶ 80.) Nor did the Arbitrator rule on the authenticity of the bond instrument. (*Id.* ¶ 81.)

IPP has brought claims for RICO violations, fraudulent inducement, and conversion against all Defendants for knowingly inducing IPP to enter into a contract with Metro on the Project. (ECF No. 23 ¶¶ 84-85.)

## III.    LEGAL STANDARD

### A.    Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6)

In order to survive a motion to dismiss under Rule 12(b)(6) for failure to state a claim, a complaint must put forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This requires more than "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id*. at 678 (citation omitted). "To survive dismissal, 'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Tatis v. Allied Interstate, LLC*, 882 F.3d 422, 426 (3d Cir. 2018) (quoting *Iqbal*, 556 U.S. at 678).

Applying the principles of *Iqbal* and *Twombly*, the Third Circuit articulated a three-part analysis to determine whether a complaint will survive a motion to dismiss under Fed. R. Civ. P.

12(b)(6). *See Santiago v. Warminster Tp.*, 629 F.3d 121, 130 (3d Cir. 2010). This three-prong inquiry involves the following: "(1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged." *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011)).

The pleading standard does not require a plaintiff to establish the elements of a *prima facie* case, but they must "put forth allegations that raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 213 (3d Cir. 2009) (internal citations omitted). "[C]onclusory or 'bare-bones' allegations will [not] survive a motion to dismiss." *Id.* at 210. "To prevent dismissal, all civil complaints must now set out 'sufficient factual matter' to show that the claim is facially plausible." *Id*.

## IV.    DISCUSSION

### A.    The Court Will Not Consider the Affidavits Submitted by Rotondo

At the Motion to Dismiss stage, a court may not consider matters outside the pleadings. Fed. R. Civ. P. 12(d). The court may only consider "allegations contained in the complaint, exhibits attached to the complaint and matters of public record." *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993). A court may also "consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Id.* If a court considers extraneous materials, the motion must be converted to a motion for summary judgment, and the parties must be given the opportunity to conduct discovery. *See* Fed. R. Civ. P. 12(d); *see also Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (citing *Cent. Contracting Co. v. Md. Cas. Co.*, 367 F.2d 341, 343 (3d Cir. 1966)). Thus, the Court has determined that in deciding Defendant Rotondo's Motion to Dismiss, it cannot

consider the affidavits submitted by Rotondo, his attorney Gerald Dandeneau, or attorney Steven Lowenhar. (*See* ECF Nos. 40-1, 40-2, and 40-3.)

**B.     The Court Will Allow the Metro Defendants to Adopt Some of FSA's Arguments.**

IPP argues that the Metro Defendants may not adopt the arguments of the FSA defendants. (ECF No. 42-1 at 32-33.) The Court disagrees with Plaintiff that Rotondo may not incorporate by reference Defendants FSA and Harris's Motion to Dismiss. Courts in this Circuit have repeatedly allowed parties to adopt by reference the arguments presented by their co-defendants. *See, e.g., Tijerina v. Volkswagen Grp. of Am., Inc*., No. 221CV18755BRMLDW, 2023 WL 6890996, at *6 (D. N.J. Oct. 19, 2023); *Kirschner v. Wachovia Cap. Markets, LLC*, No. CV 08-1518, 2009 WL 10673082, at *1 (W.D. Pa. Sept. 16, 2009); *PHP Liquidating, LLC v. Robbins*, 291 B.R. 603, 605 (D. Del. 2003), *aff'd sub nom. In re PHP Healthcare Corp.*, 128 F. App'x 839 (3d Cir. 2005); *Spillman v. Wallen*, No. 95-750, 1995 WL 491287, at *7 (E.D. Pa. Aug. 16, 1995).

However, the Court will only consider FSA's arguments as applied to the Metro Defendants when it is clear how the arguments apply. *See United States v. Ramirez-Rivera*, 800 F.3d 1, 12 (1st Cir. 2015) ("Adoption by reference cannot occur in a vacuum and the arguments must actually be transferable from the proponent's to the adopter's case."). Although the Court in *Ramirez-Rivera* was expounding on the Federal Rules of Appellate Procedure, the same reasoning applies here— in order for this Court to apply FSA's arguments to Rotondo, Metro, and MIWEC, it must be clear how they apply specifically to the Metro Defendants.

**C.     Rotondo's Motion to Vacate the Default Entered Against Him**

On November 15, 2022, the Court entered a default against Rotondo, but not Metro or MIWEC, for failure to respond to Plaintiff's complaint. Rotondo now asks the Court to vacate the default pursuant to Federal Rule of Civil Procedure 55. (ECF No. 40-4 at 5-8.) Rule 55 provides

that a court "may set aside an entry of default for good cause, and it may set aside a final default judgment under Rule 60(b)." Fed. R. Civ. P. 55(c).

The Third Circuit has "adopted a policy disfavoring default judgments and encouraging decisions on the merits," however, a trial court has discretion to determine whether it is appropriate to vacate a default judgment. *Mrs. Ressler's Food Prods. v. KZY Logistics LLC*, 675 F. App'x 136, 138 (3d Cir. 2017) (citing *Harad v. Aetna Cas. and Sur. Co.*, 839 F.2d 979, 982 (3d Cir. 1988)). In determining whether or not to vacate entry of default, a court must consider three factors: "whether (1) the plaintiff will be thereby prejudiced, (2) the defendant has a meritorious defense, and (3) the default was the result of the defendant's culpable conduct." *Nationwide Mut. Ins. Co. v. Starlight Ballroom Dance Club, Inc.*, 175 F. App'x 519, 522 (3d Cir. 2006) (citing *Harad*, 839 F.2d at 982). The Court will consider each of these factors in due course below.

### 1.      Prejudice to Plaintiff IPP

"Prejudice is established . . . when a plaintiff's 'ability to pursue the claim has been hindered . . . [by, for example,] loss of available evidence, increased potential for fraud or collusion, or substantial reliance upon the judgment." *Nationwide Mut. Ins. Co. v. Starlight Ballroom Dance Club, Inc.*, 175 F. App'x 519, 524 (3d Cir. 2006) (citing *Feliciano v. Reliant Tooling Co.*, 691 F.2d 653, 657 (3d Cir.1982)).

IPP asserts that it would be prejudiced by the Court granting the Motion to Vacate, because "Mr. Rotondo has demonstrated throughout the Arbitration proceedings and Plaintiff's efforts to serve him herein, that he will use a myriad of tactics to delay prosecution of this case, which will provide him with more time to hide assets in an attempt to defraud creditors." (ECF No. 42-1 at 18.). Rotondo disputes this, arguing that IPP has not cited to any facts in support of this argument. (ECF No. 43 at 2.)

The Court agrees with IPP's concerns about Rotondo potentially hiding assets. Although Metro and MIWEC will remain parties to this litigation, Rotondo is a distinct individual from those corporate entities, and has demonstrated that he may engage in evasive tactics that could prejudice IPP. This sufficiently demonstrates to the Court the increased potential for fraud or collusion. Therefore, the first factor weighs in favor of upholding the default.

### 2.    Rotondo's Defense and its Merit

"[A] defendant has established a meritorious defense when its 'allegations, if established at trial, would constitute a complete defense.'" *United States v. $55,518.05 in U.S. Currency*, 728 F.2d 192, 195 (3d Cir. 1984). "[D]efendants seeking to vacate a default judgment must 'allege[ ] specific facts beyond simple denials or conclusionary statements' . . . . But we do not require that a defendant's answer be in such detail that it meets 'summary judgment standards.'" *Mrs. Ressler's Food Prods.*, 657 F. App'x. at 141 (internal citations omitted).

Rotondo asserts that "through the December 14, 2022 Declaration of its Counsel, Gerald V Dandeneau . . . , [he] has demonstrated that there are multiple viable defenses to the Plaintiff's claims." (ECF No. 40-4 at 7.) These defenses include "the fact that the Metro Defendants had no contact, relationship, or affiliation of any kind with any entity controlling or executing the alleged fraudulent scheme," and that "any alleged damages the Plaintiff is claiming were already remedied by the Arbitration Award . . . ." (*Id.* at 7-8.) As previously stated, the Court will not consider arguments put forth in improper affidavits; however, the Court will look at what, if any, defenses Rotondo has included in his Motion to Dismiss. IPP argues that "[t]he Motion to Vacate contains nothing more than hollow attacks on Plaintiff's pleading and a few conclusory statements." (ECF No. 42-1 at 16.)

11

"Without a developed record it is difficult to reach a definitive conclusion regarding Defendant's defenses." *Moss v. Aaron's, Inc.,* No. CV 2:14-3753, 2014 WL 12605467, at *2 (E.D. Pa. Dec. 17, 2014). However, the Court agrees with IPP that Rotondo has only attacked IPP's pleadings, and has not presented any affirmative defenses, meritorious or otherwise, in the body of his motion. Rotondo has not asserted any defenses with specificity, such that the Court could presume them to constitute a complete defense.

Given the difficulty of evaluating this factor at the Motion to Dismiss stage, this factor weighs in favor of upholding the default.

### 3.    Rotondo's Culpability for His Default

Rotondo argues that although he was aware that this lawsuit was filed against him, his conduct was not willful such that the entry of default is justified. (ECF No. 40-4 at 6.) He argues that because of IPP's numerous proceedings against Metro, he was unable to devote the necessary attention to this case. This lawsuit was filed while the arbitration proceedings were ongoing, and Rotondo requested that the Arbitrator suspend those proceedings while he sought local counsel for this lawsuit, but the Arbitrator denied that request. (*Id.*) Rotondo asserts that he has sought to address all the issues raised by IPP, and that "any perceived delay . . . should instead be understood as Counsel for the Metro Defendant intention to insure [sic] the highest degree of work product" (*Id.* at 7.) Rotondo also suggests that he was not properly served in this case. (ECF No. 40-1 ¶¶ 14-19.) IPP disputes this characterization, and points to attempts by both Rotondo and Dandeneau to avoid service. (ECF No. 42-1 at 3.) Moreover, despite Rotondo's claim that he was never informed of the default, emails that the Metro Defendants themselves cite to say otherwise. (*See* ECF No. 43 at 13.)

Given that Rotondo admits that he was aware of this lawsuit, and at no other point in this litigation has he disputed that service was proper, the Court is not persuaded by his arguments that he was not properly served. Based on the claims IPP puts forward about Rotondo and Dandeneau's conduct with respect to service, the Court finds that Rotondo's conduct goes beyond dilatory to willful disregard for proper practices. Thus, this factor weighs in favor of upholding the default.

### 4.    The Factors Weigh in Favor of Upholding the Default

Mr. Rotondo failed to respond to IPP's complaint in a timely manner and is a sophisticated corporate defendant who is represented by counsel. Rotondo has not provided the Court with any compelling reason that the default should be vacated. The Court recognizes the Third Circuit's preference for resolving disputes on the merits, however, this Court has adopted the Third Circuit's guidance and reached the conclusion that this is a situation in which the default is warranted. Thus, Defendant Rotondo's Motion to Vacate the Default is denied.

### D.    Defendants Metro and MIWEC's Motion to Dismiss for Improper Venue or Transfer

Having upheld the default entered against Rotondo, the remaining "Metro Defendants" with respect to the Motion to Dismiss for Improper Venue or Transfer and Failure to State a Claim are Metro and MIWEC. Metro and MIWEC state that they are moving for dismissal "pursuant to Federal Rule of Civil Procedure 12(b)(3) and 28 U.S.C. § 1404(a)," as well as under the doctrine of *forum non conveniens*. (ECF No. 40-4 at 2.)

28 U.S.C. § 1404(a) gives a district court authority to transfer a civil action "[f]or the convenience of parties and witnesses, in the interest of justice . . . to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. 1404(a). *Forum non conveniens* similarly refers to a court's discretionary authority to transfer a case to another, more convenient forum. The Metro Defendants also argue that venue is

improper, but do not provide any support for that claim beyond citing the language of the 28 U.S.C. § 1391(b).

Venue is proper in (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action. 28 U.S.C. § 1391(b).

This case was brought in the Eastern District of Pennsylvania, where the Project at the very center of this case—the Conshohocken demolition project—took place. This satisfies the "substantial part of the events . . . giving rise to the claim" requirement of § 1391(b)(2). Furthermore, the Subcontract between IPP and Metro included a forum selection clause designating "any state or federal court sitting in eastern Pennsylvania" as the venue for resolving disputes not subject to arbitration. (ECF No. 23-1 at 16-17.) Thus, venue is proper and it should come as no surprise to the Metro Defendants that this case was brought here. Therefore, Metro Defendant's Motion to Dismiss for Improper Venue is denied.

The Court also declines to transfer this case under either 28 U.S.C. § 1404(a) or *forum non conveniens.* Both are discretionary vehicles to transfer a case in the interest of justice, and neither is appropriate here. When deciding whether to transfer a case under § 1404(a), *Jumara v. State Farm* presents a non-exhaustive list of public and private factors which guide a district court's decision to transfer a case. *See Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879 (3rd Cir. 1995). The private factors include: plaintiff's forum preference, defendant's preference, whether the claim arose elsewhere, convenience of the parties, convenience of witnesses, and location of books and

records. *Id*. Public factors include: enforceability of the judgment, practical considerations that improve ease and efficiency of trial, relative administrative difficulty of the fora, local interest in deciding local controversies, and a trial judge's familiarity with applicable state law. *Id*.

The private factors here weigh in favor of keeping this case in this forum. Plaintiff IPP has selected the Eastern District of Pennsylvania, and the events giving rise to their claims occurred in this district. Although the Metro Defendants' preference is also considered, they are the only defendants out of seven who seek to move this case; all other Defendants are silent on the issue of transfer. Metro Defendants' argument that New York would be a more convenient venue for Metro, a New York-based company, is also not compelling. Given this Court's physical proximity to New York and ease of travel between the two states, the travel to the Eastern District of Pennsylvania is no great inconvenience or burden on the parties.

The public factors also weigh in favor of keeping this case in the Eastern District of Pennsylvania. Pennsylvania has a vested interest in ensuring that projects that occur in this state are properly addressed. In addition, given the longevity of this case, and the many related matters, including the arbitration and state court enforcement of the arbitration award, the Court finds that it is more efficient to maintain all matters within this jurisdiction.

Finally, although the Defendants describe this as a "textbook case" for dismissal based on *forum non conveniens*, this doctrine typically applies where a court in another country is determined to be a more appropriate venue. *See, e.g.*, *Piper Aircraft Co. v. Reyno*, 454 U.S. 235 (1981); *Windt v. Qwest Commc'ns Int'l, Inc*., 529 F.3d 183 (3d Cir. 2008); *Kisano Trade & Inv. Ltd. v. Lemster*, 737 F.3d 869 (3d Cir. 2013). When evaluating a case under the doctrine of *forum non conveniens,* a plaintiff's choice of forum should rarely be disturbed, unless "an alternative forum has jurisdiction to hear the case, and when trial in the plaintiff's chosen forum would 'establish . .

. oppressiveness and vexation to a defendant . . . out of all proportion to plaintiff's convenience,' or when the 'chosen forum [is] inappropriate because of considerations affecting the court's own administrative and legal problems.'" *Windt*, 529 F.3d at 189 (citing *Koster v. (Am.) Lumbermens Mut. Cas. Co.,* 330 U.S. 518, 524 (1947)). The Metro Defendants have not shown that IPP's choice of forum is so oppressive or vexatious that it is unjustified.

For the foregoing reasons, the Metro Defendants' Motion to Transfer pursuant to 28 U.S.C. § 1404(a) or *forum non conveniens* is denied.

### E.    Collateral Estoppel

Defendants argue that IPP's complaint should be dismissed in its entirety because "IPP is collaterally estopped from bringing many of the claims set forth in its Complaint." (ECF No. 36 at 10.) Defendants assert that factual issues in the instant case have already been litigated to a final judgment at arbitration. (*Id.*) At arbitration, Metro was found liable for nearly $2 million in damages for breach of contract, and FSA was determined to have no liability to IPP under the Performance Bond. (*Id.* at 10-11.) FSA argues that the alleged damages in this case "essentially derive from Metro's alleged material contract breaches in the Subcontract with IPP, which . . . have already been extensively litigated." (*Id.* at 11.) Thus, to seek the same damages here violates the doctrine of collateral estoppel. (*Id.*)

IPP disputes that the issues in this case have previously been litigated. (ECF No. 44-1 at 13.) While the Arbitrator made a ruling on the breach of contract claims, he explicitly did not decide any questions of fraud. (*Id.*) IPP claims that it may still bring RICO and fraudulent inducement claims against FSA and Harris, because "'but for' the actions of FSA and Mr. Harris, IPP would not have awarded Metro the Subcontract and incurred damages in the amount of approximately $2,000,000.00, as determined by the Arbitrator." (*Id.*)

In order for collateral estoppel to apply under Pennsylvania law, "(1) the issue decided in the previous action must be identical to one presented in the later action; (2) the previous action resulted in a final judgment on the merits; (3) the party against whom collateral estoppel is asserted was a party to the previous action, or is in privity with a party to the previous action; and (4) the party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue in the previous action." *Ocasio v. Ollson*, 596 F. Supp. 2d 890, 896 (E.D. Pa. 2009) (internal citations omitted). Some courts in the Third Circuit have included a fifth element: whether the issue "was actually raised and decided at the prior proceeding, and whether the adjudicator confronted and decided the question or merely remarked on it in dicta." *Id.* (citing *Abdulhay v. Bethlehem Med. Arts*, 425 F.Supp.2d 646, 656 (E.D. Pa. 2006))

The Court agrees with IPP that its claims are not collaterally estopped. At arbitration, the issues considered, and ultimately ruled upon, were 1) whether Metro had breached its subcontract with IPP, and 2) whether FSA breached the terms of the Performance Bond. (ECF No. 23 ¶ 78.) The Arbitrator did not consider or rule on any issues of fraud. At arbitration, the claims involved whether Metro and FSA breached agreements they made with IPP. The questions now before this Court involve whether those defendants, among others, took steps before the agreements were ever entered into that caused IPP to enter into those agreements under false pretenses. These issues are substantively different from the breach of contract issues decided at arbitration, therefore, the claims before this Court are not precluded based on collateral estoppel.

**F.    RICO Claim (Count I)**

In Count I, IPP alleges that Defendants violated 18 U.S.C. § 1962(c) by "contracting, subcontracting, and providing fraudulent and worthless surety bonds and related instruments in

connection with various construction projects, including, but not limited to the subject Project, through a pattern of racketeering activity." (ECF No. 23 ¶¶ 90-91.)

"The RICO statute provides for civil damages for 'any person injured in his business or property by reason of a violation of [18 U.S.C. § 1962].'" *Tabas v. Tabas*, 47 F.3d 1280, 1289 (3d Cir. 1995) (quoting 18 U.S.C. § 1964(c)). To state a claim under § 1962(c), a plaintiff must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Amos v. Franklin Fin. Servs. Corp.*, 509 F. App'x 165, 167 (3d Cir. 2013) (citing *Sedima S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)).

The "racketeering activity" Plaintiff alleges Defendants engaged in include mail fraud, wire fraud, transportation of converted property, and possession of converted property. (*See* ECF No. 23 ¶¶ 93.) This triggers the heightened pleading standard for fraud claims provided in Rule 9(b). Fed. R. Civ. P. 9(b). Under Rule 9(b), "a court must decide if plaintiff has pled with particularity the 'circumstances' of the alleged fraud 'in order to place defendants on notice of the precise misconduct with which they are charged.'" *Devon IT, Inc. v. IBM Corp.*, 805 F. Supp. 2d 110, 123 (E.D. Pa. 2011) (quoting *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984)).

### 1. RICO Claim Against FSA and Harris

#### a) Conduct

FSA and Harris make several arguments about why IPP has failed to plead a RICO claim against them. (ECF No. 36 at 11.) First, they argue that even assuming the existence of an enterprise (which they dispute), IPP has not provided "specific, concrete facts showing" that the FSA Defendants "knowingly participated in the operation or management of the alleged enterprise." (*Id.* at 13-14.)

18

The "conduct" element of § 1962(c) "requires an element of direction" in the enterprise. *Reves v. Ernst & Young*, 507 U.S. 170, 178 (1993). "'[T]o conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs,' . . . one must participate in the operation or management of the enterprise itself." *Id.* (citing § 1962(c)).

The Court disagrees with Defendants' assertions that IPP has not pled specific facts as to participation in the enterprise. IPP's description of the alleged scheme among Defendants includes facts about each Defendant's role. FSA, for example, is alleged to have informed IPP that Metro was financially strong, despite having never reviewed Metro's finances. (ECF No. 23 ¶¶ 42-43.) These facts are not, as FSA attempts to argue, allegations that FSA should have known something about Metro, but rather, allegations about FSA's own actions. IPP also alleges that FSA made representations to IPP about AESG's finances as they related to IPP, stating that "AESG held cash assets with Wells Fargo Bank in the amount of at least $200M and that an escrow account in the amount of $700,000.00 . . . was set up at Wells Fargo Bank in Washington, D.C., for IPP's benefit as obligee of the bond." (ECF No. 23 ¶ 52.) The Court finds that these alleged facts are sufficiently specific as to actions taken by the FSA Defendants. Therefore, IPP has successfully met the pleading standard for the "conduct" element.

### b)      Existence of an Enterprise

The FSA Defendants also argue that IPP has failed to plead the existence of an enterprise, because it "does not delineate two distinct separate purposes for the purported association-in-fact enterprise." (ECF No. 44 at 15.) FSA states that IPP includes only "a threadbare statement suggesting that the Defendants 'might' engage in legitimate transactions," and this is insufficient and thus warrants dismissal. (*Id.*)

By stating that "the enterprise has an existence separate and apart from the pattern of activity in which it engages," the Court understands the FSA Defendants to be arguing that in order to prove the existence of an enterprise, the Plaintiff must show that the purported members engage in both legitimate and non-legitimate activity. (ECF No. 44 at 15.) However, that is not what the law requires. The language Defendants reference reads, "The 'enterprise' is not the 'pattern of racketeering activity;' it is an entity separate and apart from the pattern of activity in which it engages. The existence of an enterprise at all times remains a separate element which must be proved." *United States v. Turkette*, 452 U.S. 576, 583 (1981).

The Supreme Court in *Turkette* explained that a party alleging a RICO violation must prove both elements, the existence of an enterprise *and* the pattern of racketeering, separately from one another. The existence of an enterprise may in some cases be "inferred from the evidence showing that persons associated with the enterprise engaged in a pattern of racketeering activity." *Boyle v. U.S.*, 556 U.S. 938, 947 (2009).

The Supreme Court has also stated that an enterprise is liberally defined, and includes "'any union or group of individuals associated in fact' and that RICO reaches 'a group of persons associated together for a common purpose of engaging in a course of conduct.'" *Boyle*, 556 U.S. at 944 (citing *Turkette*, 452 U.S. at 580). Furthermore, "an association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* at 946.

IPP argues that it has met its burden of pleading the existence of an enterprise by referencing "a 'tripartite' enterprise – comprised generally of Metro, FSA, and American Eagle. FSA and American Eagle entered into a 'Trust and Surety Working Agreement' as of April 2, 2017,

20

pursuant to which FSA referred all surety applicants to American Eagle for underwriting services. FSA and American Eagle worked together to issue Metro six (6) to twelve (12) bonds, including on the subject Project. Each of the RICO Defendants participated in the operation and management of the enterprise." (ECF No. 44-1 at 16 (internal citations omitted).) After considering both parties' arguments, the Court has determined that at the Motion to Dismiss stage, this description is sufficient to allege the purpose, relationships, and longevity of an enterprise among at least the FSA Defendants and AESG. These allegations are distinct from the pattern of racketeering activity that IPP must independently plead.

<b>c)     Predicate Act</b>

The FSA Defendants next assert that IPP has failed to plead mail or wire fraud with the specificity necessary to make a strong inference of fraudulent intent. (ECF No. 36 at 16; ECF No. 40-4 at 22.)

"The elements of wire fraud are: (1) a scheme to defraud; (2) use of the wires for the purpose of executing the scheme; and (3) fraudulent intent." *Devon IT, Inc. v. IBM Corp.*, 805 F. Supp. 2d 110, 123 (E.D. Pa. 2011) (citing *United States v. Pharis*, 298 F.3d 228, 234 (3d Cir.2002)). Mail fraud is identical, except that it requires use of mail rather than use of the wires. *See United States v. Frey*, 42 F.3d 795, 797 (3d Cir. 1994). FSA's argument is focused on the third element— fraudulent intent. "An intent to defraud is ordinarily accompanied by a desire or a purpose to bring about some gain or benefit to oneself or some other person or by a desire or a purpose to cause some loss to some person." *Devon IT*, 805 F. Supp 2d at 123-4 (citing *United States v. Leahy*, 445 F.3d 634, 644 (3d Cir. 2006)).

FSA argues that IPP does not provide any support for its claims that FSA knew or should have known that AESG "lacked assets to secure the bonds or that Metro lacked bonding capacity

due to the alleged worthlessness of the bonds." (ECF No. 36 at 16.) FSA points to several factors that it contends supported the decision to grant Metro the $10,000,000 bonding capacity, including Harris's own research, Metro's 30-year history of doing business, Metro's assurances that it had resolved existing issues, and Metro's complete indemnification of FSA. (*Id.* at 16-17.) FSA also disputes IPP's claims that FSA's representations about Metro induced IPP to enter into the contract with Metro, and that in fact it was Metro's $100,000 payment that resulted in the parties entering into the contract. (*Id.* at 17.) Metro states that "IPP has not made any showing that the Defendants' representations in regards to their bonding capacity, collateral, or trusts assets were false in nature." (ECF No. 40-4 at 22.)

In support of its claim that FSA knew that Metro lacked bonding capacity, IPP points to Harris's testimony that Metro never provided him with any financial statements nor collateral for the bond. (ECF No. 23 ¶ 43.) IPP also alleges that FSA made representations about AESG's assets, despite those assets being nonexistent, and that FSA continued to work with AESG even after Maucha's indictment. (*Id.* ¶¶ 52, 67.)

Taking these allegations as true, as this Court must do at this stage, they are sufficient to allege an intent to defraud. Thus, IPP has sufficiently alleged predicate acts of racketeering activity by FSA.

### d)    Standing to Bring a RICO Claim

The final argument the FSA Defendants make with respect to IPP's RICO claim is that IPP lacks standing to bring a RICO claim, because there is no causation or relatedness between the alleged RICO violation and IPP's injuries. (ECF No. 36 at 17.) To have standing to bring a RICO claim, a plaintiff must show "(1) that he was injured (2) by reason of a violation of § 1962." *Anderson v. Ayling*, 396 F.3d 265, 269 (3d Cir. 2005). The Supreme Court has interpreted "by

reason of," to mean that "a RICO plaintiff must show that defendant's RICO violation was not only a 'but for' cause of his injury, but also that it was the proximate cause." *Id.* (citing *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992)).

FSA states that IPP's complaint contains only a conclusory claim that "[b]ecause of the misstatements and misrepresentations that all Defendants knowingly made in order to induce IPP to enter into a contract with Metro on the [] Project, IPP has incurred damages of $1,991,909.88." (ECF No. 36 at 18, citing ECF No. 23 ¶ 84, n. 3.) FSA argues that the fact that IPP is seeking the same monetary damages it was awarded at arbitration is "wholly dishonest and disingenuous" and IPP is collaterally estopped from relitigating those damages. (ECF No. 36, at 18.) The Court has already addressed the issue of collateral estoppel and determined that IPP may bring this claim, so it will not further address this argument. FSA goes on to assert that IPP has not shown a direct relationship between the injury and the alleged injurious conduct, because it was determined at arbitration that FSA's obligations under the Performance Bond were discharged due to IPP's own breaches of the bond. (*Id.* at 19.) IPP responds that proximate cause exists, because "but for" Mr. Harris and FSA's actions leading up to IPP entering the subcontract with Metro, IPP would not have entered into the contract with Metro.

The Supreme Court has explained that the proximate cause requirement is meant to ensure some direct connection between the defendant's wrongdoing and the plaintiff's injury. *See Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992) ("[W]e use 'proximate cause' to label generically the judicial tools used to limit a person's responsibility for the consequences of that person's own acts."); *Hemi Grp., LLC v. City of New York, NY*, 559 U.S. 1, 12 (2010) ("[I]n the RICO context, the focus [of proximate causation] is on the directness of the relationship between the conduct and the harm.")

IPP has repeatedly stated, and the Court has accepted its argument that this RICO claim is not about actions that occurred under the scope of the Subcontract, but rather is about the actions Defendants took that led IPP to enter into the Subcontract in the first place. Among these alleged actions are FSA's statements to IPP about Metro's financial stability. (*See, e.g.*, ECF No. 23 ¶ 42.) IPP argues that as a result of FSA's statements about Metro, as well as FSA's "trust" agreement with AESG, IPP believed that Metro was a financially secure company, and thus entered into the Subcontract, which led to IPP's injuries. The Court finds that IPP has sufficiently pled that FSA's actions were a proximate cause of IPP's entering into the subcontract with Metro.

Because IPP has met the heightened Rule 9(b) pleading standard for each of the elements of its RICO claim with respect to FSA and Harris, FSA and Harris's Motion to Dismiss the RICO claim is denied.

### 2. RICO Claim Against Metro Defendants

Again, the "Metro Defendants" addressed here are only Metro and MIWEC, as the default entered against Rotondo is upheld. The Metro Defendants argue that IPP has not sufficiently alleged a RICO claim with respect to the Metro Defendants First, the Metro Defendants dispute that IPP has sufficiently pled the first prong of the RICO statute—that Metro participated in the operation or management of the enterprise. (ECF No. 40 at 19-20.) Metro contends that IPP has not established that "any of the Metro Defendants had knowledge, nor willfully or intentionally participated in the operation or management of the alleged enterprise of AESG or Mr. Maucha in order to further the alleged fraudulent scheme." (*Id.* at 20.)

IPP responds only that it "specifically averred that Metro, MIWEC, and/or Mr. Rotondo 'participated in the operation and management of the enterprise,' and knowingly obtained

fraudulent and worthless bonds and related instruments." (ECF No. 42-1 at 33-34.) IPP cites to several paragraphs of the Amended Complaint in support of its argument. (*Id.*)

Unlike its allegations regarding FSA, which included specific representations FSA and Mr. Harris made about Metro's financial health, IPP has provided no specific facts about Metro's alleged involvement in the scheme. The mere fact that Metro received the bonds from FSA is not by itself sufficient for the Court to infer Metro's participation in the enterprise. The paragraphs in the Amended Complaint IPP cites to in support of its allegation against the Metro Defendants do not bolster IPP's case. For example, paragraph 67 states that "[e]ven after the indictment was filed against Mr. Maucha, Metro, MIWEC, and/or Mr. Rotondo have obtained bonds and related instruments from FSA." (ECF No. 23 ¶ 67.) However, IPP's RICO claim is premised on the fact that the Defendants' fraudulent actions induced IPP to enter into the Subcontract with Metro. Mr. Maucha's indictment occurred well after IPP and Metro entered into the subcontract. (ECF No. 23 ¶ 37.) IPP has not alleged any specific facts about Metro's participation in the scheme *prior* to IPP entering into the subcontract. The other paragraphs IPP states support its argument are largely conclusory allegations about Metro's involvement. (*See, e.g.*, ECF No. 23 ¶ 68 ("Metro . . . knew or should have known that the bonds and related instruments were fraudulent and worthless.").)

Having found IPP has not sufficiently pled the first element of the RICO claim, the Court need not analyze the remaining elements of the RICO claim at this time. Because the Court agrees that IPP has not satisfied the heightened pleading standard necessary to allege its RICO claim against the Metro Defendants, the Metro Defendants' Motion to Dismiss the RICO claim is granted. The Court will grant IPP leave to amend its complaint if it believes it can allege with greater specificity Metro's involvement with the scheme.

### G.    Fraudulent Inducement (Count II)

In Count II, Plaintiff alleges fraudulent inducement. To state a claim for fraudulent inducement in Pennsylvania, the Plaintiff must show "(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance." *Eigen v. Textron Lycoming Reciprocating Engine Div.*, 874 A.2d 1179, 1185 (2005) (internal citations omitted); *see also EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 275 (3d Cir. 2010).

### 1.    Fraudulent Inducement Claim Against FSA Defendants

The FSA Defendants argue that IPP did not allege that the Defendants knew the representations were false when they made them, and that IPP's damages were not proximately caused by the FSA Defendants. (ECF No. 36 at 20, 22.)

The Court has already addressed nearly identical arguments the FSA Defendants made in response to the RICO claims, and for the reasons articulated above, the Court believes IPP has sufficiently pled its fraudulent inducement claim as to the FSA Defendants. IPP identifies specific statements FSA/Harris made to it about both AESG and Metro, which plausibly induced IPP to enter into the subcontract with Metro. (ECF No. 23 ¶¶ 42, 48, 49, 51, 52.) The law requires that FSA made these representations falsely *or* with recklessness as to the truth or falsity of the statements. Whether Harris did in fact know about Maucha and AESG's lack of assets, he made representations to IPP that AESG held assets of at least $200M. Harris also told IPP that Metro's financials were strong without reviewing any documents. These facts are enough to satisfy the pleading standard at this stage.

26

Thus, the FSA Defendants' Motion to Dismiss the Fraudulent Inducement Claim is denied.

### 2. Fraudulent Inducement Claim Against Metro Defendants

The Metro Defendants argue that IPP has not shown that the Metro Defendants fraudulently induced them into entering into the subcontract, because "there is no allegation or facts brought forward . . . showing the Defendants knew of the alleged misrepresentations at the time of their commission through the indictment of Paul Maucha." (ECF No. 40-4 at 24.) The Metro Defendants also dispute that any fraud on their part was what induced IPP to enter into the subcontract; rather, IPP entered into the contract because of Metro's $100,000 payment for a bid on the Project. (*Id.* at 24-25.)

The Metro defendants also argue that IPP has not alleged damages independent from the breach of contract, and thus say that IPP's fraudulent inducement claim is barred by the economic loss doctrine, which prevents a party from recovering in tort economic losses flowing from a contract. (*Id.* at 25.) IPP responds that it has validly pled its fraudulent inducement and shown that "Defendants knew, or should have known, that they or their representatives made false statements and misrepresentations to Plaintiff and that Plaintiff replied on such representations which it selected Metro for the project." (ECF No. 42 at 36.)

For the same reasons the Court rejected IPP's RICO claim as to the Metro Defendants, it must reject IPP's fraudulent inducement claim. IPP provides no factual support for its claim that the Metro Defendants made false statements or knew that IPP was relying on false statements when it entered into the subcontract. Once again, the allegations from the complaint IPP offers fail to bolster its argument. For example, IPP points to paragraphs 78-84, which focus specifically on the arbitration proceeding and subsequent award. (*See* ECF No. 23 ¶¶ 78-84.) Again, the arbitration occurred well after IPP and Metro entered into the subcontract and the breach of contract occurred.

It remains unclear to the Court how any events related to the breach of contract are tied to IPP being induced to enter into the contract. IPP cannot on the one hand say that its claims in this lawsuit are about inducement to enter the contract and completely independent from the breach of contract, and on the other hand point to the breach of contract as evidence.

The Court has already stated that accepts that there may be valid claims about fraudulent inducement that are independent from the damages resulting from the breach of contract. However, at this point IPP has not alleged any such claim against the Metro Defendants.

The Metro Defendants' Motion to Dismiss the Fraudulent Inducement claim is dismissed without prejudice. IPP may amend its complaint if it believes it can plead its Fraudulent Inducement claim against the Metro Defendants with the requisite particularity.

### H.    Conversion (Count III)

The Metro Defendants also move to dismiss IPP's conversion claim, brought only against them. In its complaint, IPP states that the Metro Defendants have unlawfully taken, retained, or used "the lucrative scrap salvage rights" from the Project. (ECF No. 23 ¶ 108.)

The Metro Defendants argue that IPP's conversion claims "mirror the material breach of contract claims the previously alleged during the prior arbitration proceeding, both in cause and the damages amount." (ECF No. 40-4 at 27.)

In response to the Metro Defendants' Motion, IPP only states that "this action involves the false statements and misrepresentations made by the respective Defendants prior to the issuance of the Subcontract . . . ." (ECF No. 42-1 at 37.) This argument falls short of what is needed to sustain IPP's conversion claim. First, the Amended Complaint is devoid of facts describing the alleged conversion—the first reference to Metro's conversion of scrap materials appears under Count III. It is also unclear how conversion of the scrap materials—which could only have

28

occurred after Metro had begun its work on the Project—could in any way be related to misstatements made that induced IPP to enter into the Subcontract to begin with. Moreover, conversion seems to clearly fall within the scope of the breach of contract claims that were dealt with at arbitration. While the Court has ruled that IPP is not barred from bringing new claims related to events that they allege induced them to enter into the Subcontract, they are collaterally estopped from attempting to relitigate issues here that were already resolved at arbitration. IPP's conversion claim appears to the Court to be an inappropriate effort to recover funds that are owed to it pursuant to the arbitration award through another vehicle, which the Court will not accept.

Thus, the Metro Defendants' Motion to Dismiss the Conversion claim (Count III) is granted. Count III is dismissed with prejudice.

## VI.    **<u>CONCLUSION</u>**

For the foregoing reasons, the FSA Defendants' Motion to Dismiss is denied. The Metro Defendants' Motion to Dismiss is granted in part and denied in part. An appropriate order follows.

**BY THE COURT:**

**/s/ Hon. Kelley B. Hodge**

_____

**HODGE, KELLEY B., J.**